### Suydam and others *vs.* Hotchkiss and Hotchkiss.

Plaintiffs, commission merchants, were in the habit of selling flour for defendants, millers, and of acccepting defendants' drafts against such flour. Plaintiffs in summer of '41 reshipped to defendants some of their flour which had soured, and defendants re-manufactured and afterwards returned it to plaintiffs. In August, '41, defendants gave plaintiffs an order to purchase between three and four thousand bbls. of sour flour to be worked into sweet flour by defendants (they finding the wheat to be used in the re-manufacture) and returned to plaintiffs, and plaintiffs sold defendants what they had on hand belonging to third persons and agreed to buy the balance in the market. Defendants made some of the purchases in the market, and plaintiffs paid for the flour so purchased and forwarded it with the rest—in all 3220 barrels—to defendants, 1833 bbls. of it being sent to them at Troy, and defendants paying freight. After this, in the same year, plaintiffs received from defendants 4000 bbls. of flour from Troy, including the sour flour which originally belonged to defendants. In '42 plaintiffs requested defendants either to grind over the balance of sour flour or send it back to them, which defendants refused to do. Plaintiffs then brought replevin and took 1069 bbls. of the flour shipped to Troy in August, '41. At the

Suydam v. Hotchkiss.

time of this shipment plaintiffs had delivered to defendants an invoice of the 3220 bbls. of flour, as so much flour "sold to and purchased for" defendants. Plaintiffs in their letters spoke of this lot of flour as belonging to and having been shipped for defendants, and defendants were charged with the amount in the general accounts current furnished by plaintiffs. Plaintiffs' witness (their clerk) testified that it was understood that this lot of 3220 bbls. was to be in the possession of plaintiffs only, and was to be returned to them as soon as ground over. *Held*, that there was a complete sale and delivery of the 3220 bbls. of flour by plaintiffs to defendants, and that plaintiffs could not recover the property in replevin.

REPLEVIN for 1069 barrels of flour tried before KENT, Cir. J. at the New York circuit in February, 1843. The plaintiffs were commission merchants in the city of New York, and the defendants were millers at Phelps, Ontario county. The defendants also re-manufactured sour flour at the city of Troy. There had been extensive dealings between the parties, the defendants consigning their flour to the plaintiffs to be sold, and drawing on the plaintiffs for funds to carry on the business. The plaintiffs proved by A. Wells their clerk, that in the summer of 1841, the plaintiffs had on hand some flour of the defendants which had soured; it was shipped to the defendants at Troy to be re-manufactured by grinding it over with good wheat, and was afterwards returned to the plaintiffs. In August of that year, the defendants came to the plaintiffs to buy a quantity of sour flour to be re-manfuactured; they wanted between three and four thousand barrels to be mixed with wheat and worked up into sweet flour to be returned to the plaintiffs. The plaintiffs agreed to sell to the defendants what they had on hand belonging to their customers, and to purchase in the market enough to make up the balance. The defendants made some of the purchases from third persons, and directed the vendors to call on the plaintiffs for the price; and the plaintiffs paid for this flour and forwarded it with the rest. The defendants were to find the wheat to be used in the re-manufacture, and draw on the plaintiffs to pay for it. The gross amount of sour flour purchased for and sold to the defendants was 3220 barrels; of this quantity 1833 were sent to Troy. After this and before the close of navigation

13

in the fall of that year, the plaintiffs received from the defendants about 4000 barrels of flour from Troy. This included the first transaction—or the sour flour which originally belonged to the defendants. The receipts of flour from Troy ceased early in December, 1841. In April, 1842, the parties had a conversation in New York about the sour flour. The plaintiffs said they wished the defendants either to grind over the balance of the sour flour immediately, or to send it back to them. The defendants answered that they should do nothing about it. The plaintiffs then went to Troy, where the defendants had been re-manufacturing the sour flour, and found with the millers whom the defendants had employed in that business, 1069 barrels of the same flour which the plaintiffs had delivered in August, 1841, and after a demand upon those millers, took the flour by virtue of the writ of replevin by which this suit was commenced. When the plaintiffs had completed the purchases of sour flour under the foregoing arrangement, on the 27th August, 1841, they made and delivered to the defendants an invoice of the whole 3220 barrels, as so much flour "sold to and purchased for" the defendants. The plaintiffs shipped the flour in several parcels, and consigned it to A. Van Inwegen of Troy, who was the defendants' agent at that place, he paying freight. In one of the letters accompanying the bills of lading sent to Van Inwegen, the plaintiffs mentioned that the flour was shipped for the defendants; in another letter the plaintiffs said the flour belonged to the defendants. The plaintiffs had also made out and delivered bills of different parcels of flour as follows:—"Messrs. H. G. & L. B. Hotchkiss, bought of Suydam, Sage & Co.," so many barrels of bad flour. The witness Wells further said, " as to the lot of 3220 barrels of sour flour, it was understood that it was to be in the possession of the plaintiffs only, and shipped to Troy to be ground over and returned as soon as ground over to the plaintiffs." The witness said he could not give the words of the agreement. The defendants were to have the whole profits and sustain all the loss of the transaction.

It further appeared that the plaintiffs charged the defend-

flour, amounting to $18,167.48, which sum was carried into the account in the same manner as the other items of debit. The plaintiffs had also furnished the defendants with accounts current of the various transactions of the parties in which the defendants were made debtors for the flour in question; and in October, 1841, the plaintiffs called on the defendants for the payment of the balance in which the plaintiffs were then in advance for the defendants, which, including the sour flour, amounted to $16,000. This balance was fully paid by the defendants within a few days afterwards. But the plaintiffs were then under acceptances for the defendants in a considerable sum, which were not yet payable. The funds to pay the above balance were raised by drafts on the plaintiffs payable at future periods, which the plaintiffs accepted for the accommodation of the defendants.

The defendants paid the freight on the shipments of flour and purchased large quantities of wheat which was ground with the sour flour. The mixture in the re-manufacture was about four parts of wheat to one part of sour flour. The defendants raised the funds to pay freight and purchase wheat by drawing on the plaintiffs.

The judge refused a motion by the defendants for a non-suit, and charged the jury, among other things, that if the agreement was that the plaintiffs were to have the possession of the flour until re-manufactured and returned, it was an agreement which should be respected, and would give the plaintiffs a lien. The jury found a verdict for the plaintiffs, and the defendants move for a new trial on a case.

*A. Worden,* for defendants.

*M. T. Reynolds,* for plaintiffs.

*By the Court,* BRONSON, J   It is unnecessary to go at large into the extensive dealings between these parties. The principal part of the account relates to the flour which the defendants manufactured at Phelps, and consigned to the plaintiffs for sale, and the drafts which the defendants made on the plaintiffs on account of that business.   Although

the sour flour and the drafts connected with it went into the general account, it was in most respects an independent transaction. Nor is it important to notice the fact that a portion of the flour which went to Troy te be re-manufactured came originally from the mill at Phelps, and soured while in the hands of the plaintiffs. The suit relates wholly to other flour—such as the plaintiffs had in their hands upon consignment from third persons, and such as they purchased in the market for the purpose of filling the defendants' order for sour flour to be ground over at Troy. As to that flour, I have been unable to read the testimony without coming to the conclusion that the title passed to the defendants as purchasers. Mr. Wells, the plaintiffs' clerk, speaks of it from the beginning to the end of his testimony, with a single qualification, as a purchase and sale of the flour ; and all the documentary evidence, of which there is a great mass, goes to confirm his statement. Mr. Wells says the defendants came to the plaintiffs to *buy* a quantity of sour flour, and the plaintiffs agreed to *sell* what they had on hand, and to purchase in the market enough to make up the balance. The agreement was executed, and the wheat sent to the defendants at Troy, and charged to their account. There was a complete sale and delivery of the property. It was not a conditional, but an absolute sale. Now let us see what was the qualification spoken of by the witness. He says, it was understood that the flour was to be in the possession of the plaintiffs only, and shipped to Troy to be ground over and returned to the plaintiffs. The witness can not give the words which passed between the parties ; and his understanding of the matter involves something which to my mind appears very much like a contradiction. I can not comprehend how the property could be sold and delivered to the defendants, and yet remain in possession of the plaintiffs. The parties may very well have agreed that the new flour should be sent to the plaintiffs for sale, in the same way that the plaintiffs held other flour of the defendants ; but that would not change the title, or give the plaintiffs even a special property in the flour, until it had in fact been sent to them. When the parties commenced their

earlier transactions there was undoubtedly an understanding
that the plaintiffs should accept drafts, and that the defend-
ants should consign flour from their mills at Phelps to meet
the acceptances; but this could not affect the title to the
flour which the defendants manufactured, until it was
actually consigned to the plaintiffs. And the case is sub-
stantially the same of the flour which was to be re-manufac-
tured at Troy. If the defendants were wrong in not
grinding over and returning all of the damaged flour, they
are chargeable with the breach of an executory agreement;
but that could not change the title to the property. The
fact that the defendants drew on the plaintiffs for funds to
pay freight, and to purchase wheat to be used in re-manu-
facturing the flour, proves nothing. The defendants raised
funds in the same way to purchase wheat to be manufac-
tured at Phelps. But the wheat purchased at both places,
and the flour made from it belonged to the defendants, until
they performed their agreement by consigning the flour to
the plaintiffs.

If the witness means more than that the defendants agreed
to return the new flour to the plaintiffs to be held, as they
held the western flour, to meet their acceptances for the
defendants, the evidence is open to the objection that it
contradicts the written evidence of title, and therefore was
not admissible. The plaintiffs not only charged the defend-
ants with the flour as upon a sale, and rendered accounts
claiming to be paid the balance, but they delivered bills
and an invoice of the flour as so much property which they
had sold to the defendants, and shipped and consigned the
flour to the agent of the defendants at Troy. In the letters
of advice which accompanied the bills of lading, the plaint-
iffs spoke of the flour as belonging to the defendants; and
in the whole mass of written evidence, there is not a single
word which tends to the conclusion that the transaction
came any thing short of an absolute sale of the property.

The plaintiffs say it is improbable that they would make
an absolute sale on credit to so large an amount, when they
were already under heavy acceptances for the defendants.
Anticipating such an argument, the defendants offered to

prove on the trial that at the time of the sale they were in good credit as merchants and business men, and reputed to be wealthy; and that they still continued to enjoy that reputation. After objecting to that evidence and having it excluded, the plaintiffs can not suppose that much importance will be attached to the argument which is based upon the supposed improbability of their making an absolute sale. And besides, probabilities are of no great force when weighed against full written evidence of title.

It is clear that this was not a bailment of the flour. Indeed, the plaintiffs have made no point that it was a bailment. They say, a factor has a lien for advances, and they were in advance to the defendants. But what has the law of principal and factor to do with this question? The plaintiffs may have had a lien as factors upon all the flour which the defendants sent them either from Phelps or Troy. But they were not factors in selling this flour to the defendants. The only relation between the parties in this transaction was that of vendors and purchasers. The relation of principal and agent could not arise until the flour was returned. It is admitted that the defendants were the general owners, but insisted that the plaintiffs had a special property in the flour. It is true, that the defendants are general owners; but how did they become such? The only answer is, by a sale and purchase. The plaintiffs first owned this flour, and the title could only pass to the defendants by a sale. And if there was a sale and delivery to the defendants, the plaintiffs no longer had any property, either general or special, in the flour. They are obliged to resort to the absurd understanding of the witness, that notwithstanding the sale and delivery, the possession was to be with the plaintiffs. That was impossible from the nature of the case. The witness does not say that the plaintiffs were to have a lien upon the flour; and it is difficult to suppose that any such thing was intended by the parties. The defendants were to mix and grind over the flour with fresh wheat, in the proportions of about one to four. How could the plaintiffs trace the flour after it had been thus mingled with other property? The thing would be impossible. The

plaintiffs may have had in their minds some vague notion about preserving a right to follow and re-take the property ; but they did not adopt the proper means to secure that end. There can be no such thing as a lien in the vendor where the property is delivered to the vendee. There may be a conditional sale ; or to speak more properly, there may be an executory agreement to sell provided certain conditions are performed, and the delivery of the property under such an agreement will not prevent the owner from re-taking the goods if the conditions are not performed. (*Strong* v. *Taylor*, 2 Hill, 326.) But there was no such agreement or condition in this case. The sale and delivery were absolute, and the vendors had no right to follow the flour. I see no principle which upon this action can be maintained.

New trial granted.